No. 95-419

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JAMES ROBERT SIEGAL, DOYLE
WAYNE JONES and JAMES JEREMIAH
MCINTYRE,

Defendants and Appellants.

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Madison,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William A. Hritsco, Davis, Warren & Hritsco, Dillon,
Montana (Jones); Vincent J. Kozakiewicz, Dillon,
Montana (McIntyre); Andrew P. Suenram, Hoffman
& Suenram, Dillon, Montana (Siegal)

For Respondent:

Joseph P. Mazurek, Attorney General, Chris D.
Tweeten, Assistant Attorney General, Helena,
Montana; Loren Tucker, Madison County Attorney,
Robert Zenker, Deputy Madison County Attorney,Joseph
E. Thaggard, Special Deputy Madison County Attorney,

Virginia City, Montana


Heard: October 24, 1996
Submitted: November 7, 1996

Decided:  March 6, 1997
Filed:


_____
Clerk
Justice James C. Nelson delivered the Opinion of the Court.


Defendants James Robert Siegal (Siegal), Doyle Wayne Jones (Jones) and James Jeremiah McIntyre (McIntyre) moved to suppress the fruits of a search on the ground that the warrantless use of a thermal imager violated their constitutional rights.  In addition, Jones moved to dismiss the charges against him on the ground that his Fifth Amendment protection against double jeopardy had been violated.  The District Court for the Fifth Judicial District, Madison County, denied the motions and Defendants appeal.   We reverse.

Defendants raise the following issues on appeal:

1.    Was the warrantless use of a thermal imager an unconstitutional search?

2.    Did the election by the State not to make a videotape of the results obtained by the thermal imager constitute destruction of exculpatory evidence?

3.    Did sufficient probable cause exist to support the issuance of a search warrant for Defendants' premises?

4.    Did the District Court err in denying Jones' Motion to Dismiss the criminal proceedings against him on double jeopardy grounds after the State obtained a judgment against him in a civil forfeiture action?

Factual and Procedural Background

In October 1993, McIntyre purchased a ten-acre parcel of property with a ranch house and outbuildings near Waterloo, Montana.  The property is heavily wooded and completely fenced.  McIntyre and Jones occupied the ranch house.  They took numerous steps to insure their privacy including posting the property with "No Trespassing" signs, painting the fence posts orange, maintaining perimeter and interior fences and locking the gates.

Shortly after purchasing the property, McIntyre and Jones constructed a 30-by-70-foot building approximately 126 feet from the ranch house.  On August 25, 1994, members of the Southwest

Montana Drug Task Force searched the buildings on the property pursuant to a search warrant issued by the Fifth Judicial District Court. The search disclosed that the newly constructed building was being used to grow marijuana.

The Application for Search Warrant states that in the early morning hours of June 2, 1994, Stanton Hayes, an agent with the Narcotics Investigation Bureau of the Montana Department of Justice (NIB), used a thermal imager to measure heat emissions from the buildings on the property. Hayes had been certified in the use of the device by the Drug Enforcement Administration (DEA) in October 1993. He conducted the scan from the property of a neighbor, who had given permission for Hayes to be there, at a vantage point of about 25 to 30 feet from the grow shed.

The thermal imager showed that the grow shed was discharging a considerable amount of heat. Hayes determined that the distribution of heat energy was consistent with the presence of grow lamps hanging from the ceiling. In contrast, a scan of the other buildings on the property showed them to be normal in their heat emissions.

Hayes admitted at the suppression hearing, that he had not obtained a search warrant to use the thermal imager and that there were no exigent circumstances at the time which would lead him to believe that any evidence would dissipate prior to obtaining a search warrant. Although the thermal imager is capable of making a videotape, Hayes elected not to do so on this occasion. Hayes was required to walk a substantial distance in the dark over uneven terrain, crossing fences and irrigation ditches in order to reach the vantage point from which he conducted the scan. He stated that carrying the extra equipment, which weighed almost 20 pounds, would have created a substantial risk of injury to himself or damage to the equipment, and he doubted the practicality of wiring up the videotape in the dark.

On the basis of information obtained from citizen informants, a sheriff's investigation, and the thermal imaging scan, a search warrant was issued. The search of the grow shed revealed that it was divided into three rooms. One room contained a diesel generator that provided electricity to the building and 23 pounds of drying marijuana. A second room contained 167 marijuana plants growing under artificial light. The third room contained 72 mature, budding marijuana plants, also growing under artificial light. Based on the evidence obtained in the search, warrants were issued for the arrest of Jones, McIntyre and Siegal.

On August 30, 1994, Jones, McIntyre and Siegal were charged by information with Criminal Possession with Intent to Sell, a felony, in violation of 45-9-103, MCA, and Criminal Production or Manufacture of Dangerous Drugs, a felony, in violation of 45-9-110, MCA. All three Defendants appeared for an initial appearance, received court-appointed counsel, and subsequently pleaded not

guilty.  In November and December 1994, all three Defendants filed motions to suppress the fruits of the search on the ground that the warrantless use of the thermal imager violated their rights under the Fourth Amendment to the United States Constitution and Article II, Sections 10 and 11 of the Montana Constitution.

A hearing on Defendants' motions to suppress was held on January 10, 1995, wherein the District Court heard testimony from expert witnesses regarding the use of the thermal imager.  On March 23, 1995, the court issued its Findings of Fact, Conclusions of Law and Order denying Defendants' motions.

In addition to the criminal charges filed against Defendants, on September 1, 1994, the State filed a civil forfeiture action against real and personal property seized from Defendants.  The State contended that every item seized pursuant to the search warrant issued in the criminal proceeding was used, or intended for use, in the commission of, or to facilitate the commission of, a violation of Title 45, Chapter 9, Montana Code Annotated.  In its prayer for relief, the State requested  that the District Court enter a judgment forfeiting the property to the Madison County Sheriff's Department and the NIB in the event Defendants failed to respond to the petition and a default might be entered.

On September 30, 1994, the State filed a Motion for Partial Forfeiture of Respondent Properties and a supporting brief stating that neither Jones nor Siegal had responded within the allotted time.  Thus the State requested that the court enter an order of forfeiture against Jones and Siegal granting all of their right, title and interest in the properties to the State.  The District Court signed an order to that effect on October 7, 1994.  On October 18, 1994, the State filed an Amended Petition to Institute Forfeiture Proceedings, in an effort to include additional property.

On April 18, 1995, the State filed a Motion to Dismiss the civil forfeiture action.  The State gave no reason for its Motion to Dismiss before obtaining an ex parte Order granting the dismissal.  In a subsequent telephone conversation with defense counsel, a Deputy County Attorney for Madison County acknowledged that the State had concluded that to pursue both the civil forfeiture action and the criminal action would constitute double jeopardy.

Jones filed a Motion to Dismiss the criminal charges against him on April 25, 1995, based upon the theory that the State had already punished him in the civil forfeiture action and that further proceedings in the criminal action were barred by the double jeopardy clause's prohibition of multiple punishments for a single offense.  The District Court summarily denied Jones' motion.

On June 20, 1995, both Jones and McIntyre withdrew their not guilty pleas and pleaded guilty to the charges against them.  They

each signed an Acknowledgment of Waiver of Rights wherein they reserved the right to appeal the denial of their Motions to Suppress and, in Jones' case, his Motion to Dismiss as well. Both Jones and McIntyre were sentenced to 10 years at Montana State Prison and ordered to pay restitution in the amount of $10,000, however, the District Court stayed execution of their sentences pending appeal.

On July 25, 1995, Siegal withdrew his not guilty plea and, pursuant to an agreement with the State, entered a plea of guilty to the charge of Criminal Production or Manufacture of Dangerous Drugs. The State dismissed the other charge against him and he was given 6 years deferred imposition of sentence. In his Acknowledgment of Waiver of Rights, Siegal also reserved the right to appeal the denial of his Motion to Suppress.

## Standard of Review

The standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. Williams (1995), 273 Mont. 459, 462, 904 P.2d 1019, 1021 (citing State v. Flack (1993), 260 Mont. 181, 188, 860 P.2d 89, 94).

## Issue 1.

## Was the warrantless use of a thermal imager an unconstitutional search?

The legal question which we address in this case is whether law enforcement authorities may utilize thermal imaging technology to observe a structure suspected of concealing an indoor marijuana growing operation without first obtaining a search warrant. In other words, may law enforcement utilize warrantless thermal imaging of a structure to gather information and probable cause for the later issuance of a search warrant, or does the use of thermal imaging technology to gather information about the activities inside a structure itself constitute a search which can be accomplished only with judicial oversight and following the issuance of a search warrant?

We conclude that the use of thermal imaging in the context of a criminal investigation constitutes a search under Article II, Section 11 of the Montana Constitution. Moreover, we conclude that the privacy interests uniquely protected by Article II, Section 10 of the Montana Constitution are also implicated by the use of thermal imaging in the context of a criminal investigation and that the use of this technology by the government, in the absence of a search warrant, requires the demonstration of a compelling state interest other than enforcement of the criminal laws.

## Thermal Imaging Technology

Indoor marijuana growing operations utilize incandescent heat lamps to mimic the sunþs radiation. While structures concealing

this sort of activity may appear no different to the naked eye than other structures, indoor marijuana growing operations typically generate substantial amounts of heat and, hence, infrared radiation, which, with the proper technology, can be detected from outside the structure.  It is the warrantless use of this technology in the investigation of one such operation that concerns us here.

A discussion of the basic physical properties of infrared radiation and of the present capabilities of infrared imaging devices is necessary to understanding our decision in this case. Infrared radiation is a form of electromagnetic radiation and is subject to the same physical laws as visible light, radio waves and x-rays.  Infrared radiation is produced by any object which emits heat.  Any object with a temperature above absolute zero (0øK or - 273øC) will emit heat, and, thus, infrared radiation.  An object does not have to be "hot" to emit infrared radiation; even cold objects, such as ice cubes, or heavily insulated objects emit heat. However, the hotter the object, the more heat it produces and, hence, the more infrared radiation the object emits.

While visible light is perceived by the human eye, usually unaided, infrared radiation, because of its longer wavelength, is invisible and cannot be "seen" without the aid of a device, commonly known as a thermal imager, an infrared imager or Forward Looking Infra-Red Radar (F.L.I.R.).  This device is not unlike an ordinary home video camera.  Once directed toward the object to be scanned, the thermal imager collects infrared radiation emitted by the object, translates the radiant signal first into an electrical signal and then into a visual image and, finally, displays the image in the imager itself or on a commercial TV monitor. The displayed image can also be recorded on a standard VCR.  Warmer images appear lighter on the display and typically the imager is capable of electronically enhancing or reducing features and assigning colors to different temperature levels.  Some imagers are capable of registering temperature differences as little as 0.1øC. The thermal imager does not itself, emit beams or rays, but only passively collects infrared radiation emitted by the object being observed.

When used in the investigation of a suspected marijuana growing operation, thermal imaging of a structure is usually done at night to avoid the interference of the sun.  Typically, before scanning the suspected structure, the operator will image neighboring structures to determine how much radiation is being emitted from those under the climatic conditions present.  A structure concealing an active marijuana growing operation will generally exhibit a heat profile or signature substantially different than nearby structures which do not house this sort of activity. Thermal imaging of suspected and non-suspected structures alike, can be accomplished unobtrusively either from the ground or

from the air at some distance from the structure being observed.

At present, thermal imagers do not "see through walls" or produce a distinct image of a person, object or activity within a structure, unless, for example, a person has his body pressed against a window. Rather, thermal imaging will reveal that an enclosed structure contains a source of heat and the relative quantity of heat being produced. Thermal imaging does not differentiate between a heat source produced by a legal activity--a green house for African Violets, or an indoor hot tub, for example,--or one produced by an illegal activity such as growing marijuana. While choice of building materials and insulation will slow infrared emissions from the inside of a structure, as long as the atmosphere surrounding a structure is cooler than its interior, the laws of thermodynamics dictate that heat will inevitably be transferred to the atmosphere and that this energy cannot be contained indefinitely.

Thus, law enforcement authorities use thermal imaging inferentially to provide information as to the activity on-going in a particular structure. A structure concealing a marijuana growing operation may have an unusual heat profile compared to neighboring structures. While such a profile may be consistent with an indoor marijuana growing operation, it is not necessarily proof of one.

Legal Analysis

As the State correctly points out, most of the courts that have addressed the use of thermal imaging in the investigation of marijuana growing operations have held that the warrantless use of such technology does not violate the Fourth Amendment. These courts have uniformly relied on the two-tiered analysis proposed by Justice Harlan in his concurrence to the majority opinion in Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, to determine the constitutionality of warrantless thermal imaging.

The defendant in Katz was convicted of a violation of a federal statute prohibiting the interstate transmission of wagering information by telephone. To obtain evidence against the defendant, FBI agents attached an electronic listening and recording device to the outside of the public telephone booth from which the defendant placed his calls. The defendant objected to the use of this evidence at his trial contending that it had been obtained in violation of the Fourth Amendment.

In declaring the Government's warrantless use of the electronic listening and recording device unconstitutional, the United States Supreme Court stated:

What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

[Citations omitted.]

Katz, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582.

The Court was unpersuaded by the Government's contention that the Fourth Amendment was not implicated in this case since the surveillance technique it employed did not involve a physical penetration of the telephone booth.  The Court concluded that the Government's activities "violated the privacy upon which [the defendant] justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."  Katz, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583.

In concurring with the majority opinion, Justice Harlan summarized the rule that has emerged from Katz and from prior decisions  as requiring, "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588.

The Court adopted this two-prong test from Justice Harlan's concurrence in Katz in its decision in Smith v. Maryland (1979), 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220.  In Smith, a woman began receiving threatening and obscene telephone calls from a man who identified himself as the person who had recently robbed her.  After tracing the license plate number of a car matching the description of the robber's vehicle to Smith, the police requested that the telephone company install a pen register to record the numbers dialed from Smith's home telephone.  The police did not obtain a warrant or a court order before making the request.  When the pen register revealed that Smith was placing calls to the woman, the police used this and other information to obtain a warrant to search Smith's residence.  The search revealed that a page in Smith's phone book was turned to the woman's name and number.

Smith sought to suppress all evidence derived from the use of the pen register on the ground that the police had failed to secure a warrant before using the device.  The trial court denied the suppression motion and Smith was convicted.  The Maryland Court of Appeals affirmed Smith's conviction.

The United States Supreme Court affirmed the decisions of the lower courts and stated that

the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action.

Smith, 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226 (citations omitted).

The Court concluded that Smith did not entertain an actual

expectation of privacy in the phone numbers he dialed, and that, even if he did, his expectation was not "legitimate." Thus, the Court held that the installation and use of a pen register is not a search as contemplated by the Fourth Amendment and no warrant was required. Smith, 442 U.S. at 745-46, 99 S.Ct. at 2583, 61 L.Ed.2d at 230.

Seventeen years after its decision in Katz, the United States Supreme Court clarified the second prong of Justice Harlan's test when the Court issued its opinion in Oliver v. United States (1984), 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214. Oliver involved two cases consolidated for review. In the first case, Kentucky State Police narcotics agents ignored a locked gate and "No Trespassing" signs and entered Oliver's property where they discovered a field of marijuana about a mile from Oliver's house. The trial court suppressed evidence of the discovery of the marijuana field finding that Oliver had a reasonable expectation that the field would remain private because Oliver had done all that could be expected of him to assert his privacy in the area of the farm that was searched. The trial court noted that the field was highly secluded as it is bounded on all sides by woods, fences and embankments and could not be seen from any point of public access. The Sixth Circuit Court of Appeals reversed, reasoning that activities that create the need for privacy do not ordinarily take place in open fields. Oliver, 466 U.S. at 174, 104 S.Ct. at 1739, 80 L.Ed.2d at 221.

In the second case, pursuant to an anonymous tip, two police officers entered the woods by a path between the defendant's residence and a neighboring house. They followed a footpath through the woods until they reached two marijuana patches fenced with chicken wire. The officers determined that the marijuana was on the defendant's property and they obtained a warrant to search the property and seize the marijuana. The trial court granted the defendant's motion to suppress the fruits of the second search because the warrant for that search was premised on information obtained during the prior warrantless search. The Maine Supreme Judicial Court affirmed reasoning that the open-fields doctrine did not justify the search as that doctrine applies only when officers are lawfully present on property and observe "open and patent" activity. Oliver, 466 U.S. at 175, 104 S.Ct. at 1739, 80 L.Ed.2d at 222.

The United States Supreme Court determined that in both cases, the government's intrusion upon the open fields was not an unreasonable search as proscribed by the Fourth Amendment because "open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." Oliver, 466 U.S. at 179, 104 S.Ct. at 1741, 80 L.Ed.2d at 224. The Court concluded that "an individual has no legitimate expectation that open fields will

remain free from warrantless intrusion by government officers."
Oliver, 466 U.S. at 181, 104 S.Ct. at 1742, 80 L.Ed.2d at 225-26.
In determining whether the expectation of privacy was
legitimate in the sense required by the Fourth Amendment, the Court
stated:

The test of legitimacy is not whether the individual
chooses to conceal assertedly "private" activity.
Rather, the correct inquiry is whether the government's
intrusion infringes upon the personal and societal values
protected by the Fourth Amendment.

Oliver, 466 U.S. at 182-83, 104 S.Ct. at 1743, 80 L.Ed.2d at 227.
The Montana Supreme Court has on numerous occasions relied on
Katz and Smith and the two-pronged test delineated in those cases
to determine whether a warrantless search was reasonable. However,
in addition to the holdings in those cases, this Court has relied
in some circumstances on the unique privacy provisions of Montana's
Constitution.

Montana's constitutional provision regarding searches and
seizures mirrors the Fourth Amendment to the United States
Constitution:

Searches and seizures. The people shall be secure
in their persons, papers, homes and effects from
unreasonable searches and seizures. No warrant to search
any place, or seize any person or thing shall issue
without describing the place to be searched or the person
or thing to be seized, or without probable cause,
supported by oath or affirmation reduced to writing.

Art. II, Sec. 11, Mont.Const. Additionally, when the people of
Montana ratified a new State Constitution in 1972, they explicitly
granted Montana citizens the right to privacy:

Right of privacy. The right of individual privacy
is essential to the well-being of a free society and
shall not be infringed without the showing of a
compelling state interest.

Art. II, Sec. 10, Mont.Const. Thus, Montana's Constitution affords
citizens broader protection at the hands of the government in
search and seizure cases than does the Federal Constitution.
We applied this "broader protection" in our decision in State
v. Solis (1984), 214 Mont. 310, 693 P.2d 518, among others. In
Solis, defendant was videotaped in the act of selling stolen
tractor tires to an undercover officer. Prior to making the
videotapes, law enforcement officers had neither sought nor
obtained a search warrant. When the undercover officer was
unavailable to testify against defendant at his trial, the State
attempted to introduce the videotapes. However, the trial judge
granted defendant's motion to suppress and the State appealed.

Citing the two-pronged test from Katz as applied by this Court in Missoulian v. Board of Regents of Higher Educ. (1984), 207 Mont. 513, 675 P.2d 962, we held that defendant did exhibit an actual expectation of privacy in his conversations with the undercover officer and that defendant's expectation of privacy was reasonable. In making this determination, we rejected the holdings of prior federal cases that stated that government agents do not need official approval before recording conversations with the consent of one of the conversants.  Basing our decision on Montana's privacy provision, we stated in Solis that we would not be bound by decisions of the United States Supreme Court where independent grounds exist for reaching a contrary result.  Solis, 693 P.2d at 521.

We also said in Solis that if a defendant's privacy expectation was reasonable, it could not be invaded absent a compelling state interest and a compelling state interest exists "where the state enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens."  Solis, 693 P.2d at 522 (quoting State ex rel. Zander v. District Court (1979), 180 Mont. 548, 556, 591 P.2d 656, 660). However, we subsequently recognized that when the government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling interest. State v. Pastos (1994), 269 Mont. 43, 47, 887 P.2d 199, 202.

Prior to 1995, this Court adhered to the doctrine that an individual does not have a legitimate expectation of privacy in an open field; the same doctrine that the United States Supreme Court upheld in Oliver.  See State v. Charvat (1978), 175 Mont. 267, 573 P.2d 660; State v. Bennett (1983), 205 Mont. 117, 666 P.2d 747. However, in State v. Bullock (1995), 272 Mont. 361, 384, 901 P.2d 61, 76, this Court overruled Charvat, Bennett and several other cases with similar holdings.  Once again we based our decision on the unique privacy provisions in Montana's Constitution.

In Bullock, law enforcement officers, who had earlier been alerted that defendants had illegally killed an elk, entered the property of one of the defendants without a warrant and observed the carcass of a large bull elk hanging from a tree near the cabin. Access to defendant's property was by a forest service road and the property was separated from that road by a fence.  "No Trespassing" signs were posted on trees on each side of the gate at the entrance to defendant's property.  Defendant's cabin was located more than 300 feet from the forest service road at the end of a private road. The cabin and other structures on the property were concealed from the forest service road because the terrain in between was slightly elevated.  Neither the cabin nor the elk could be seen from the forest service road.

The parties in Bullock stipulated that anyone who wished to enter the property in the past had called defendant beforehand to

ask permission. In fact, the Jefferson County Sheriff's Office had done just that a few days earlier prior to conducting a search for lost hunters. On the date in question, the officers neither asked nor received permission to be on defendant's property.

In reversing the district court's denial of defendant's motion to suppress, this Court concluded that

in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, "No Trespassing," or similar signs . . . entry by law enforcement officers requires permission or a warrant.

Bullock, 901 P.2d at 75-76.

Thus, while we analyze most search and seizure questions implicating Article II, Section 11 of Montana's Constitution under traditional Fourth Amendment principles enunciated by the federal courts and adopted in our own case law, in certain instances where Montana's constitutional right of privacy, Article II, Section 10, is also specially implicated, we must, of necessity, consider and address the effect of that unique constitutional mandate on the question before us.

As we will point out in greater detail later in this opinion, the proceedings of the 1972 Montana Constitutional Convention disclose on the part of the delegates a particular concern over the intrusion of the government into the privacy of Montanans through the use of various types of electronic monitoring and surveillance. That concern was the focus of Article II, Section 10, and, significantly, led to a specific right of privacy being included in the 1972 Montana Constitution.

Accordingly, given the nature of the search and seizure question at issue here, it is appropriate and necessary that we address the warrantless use of thermal imaging in the context of not only traditional Fourth Amendment principles under Article II, Section 11 of the Montana Constitution, but under the broader protections afforded by Article II, Section 10, as well. We begin our analysis with a review of the case law.

Search and Seizure Analysis

The warrantless use of thermal imaging in criminal cases is an issue of first impression in Montana. However, the cases from other jurisdictions that have discussed this issue have generally used at least one of the following three approaches: the waste-heat approach, the canine-sniff approach, or the technological approach. We will examine each of these approaches in turn along with some of the relevant cases.

The Waste-Heat Approach

Using this approach, some courts have analogized heat to garbage left outside one's home.  Since a warrant is not required to examine curbside garbage, these courts reason that, in the same way, no warrant is required to examine heat discarded from one's home.  This approach finds its genesis in the case of California v. Greenwood (1988), 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30, wherein law enforcement officers, lacking a warrant, searched the garbage left for collection outside the curtilage of a home.

In Greenwood, the Laguna Beach Police Department received information that Greenwood might be engaged in narcotics trafficking.  In conducting a surveillance of Greenwood's home, an officer asked the neighborhood trash collector to pick up the garbage bags that Greenwood left on the curb in front of his house and to deliver them to the officer without mixing their contents with garbage from other houses.  The officer then searched through Greenwood's garbage and found items "indicative of narcotics use."  The officer used this information to obtain a warrant to search Greenwood's home where quantities of cocaine and hashish were found.  Greenwood was arrested and subsequently posted bail.

A few weeks later, another officer again searched Greenwood's garbage and found evidence of narcotics use.  A search warrant was issued based on the information from the second garbage search.

The police found more narcotics and evidence of narcotics trafficking in their search of Greenwood's home and Greenwood was again arrested.  The Superior Court dismissed the charges against Greenwood based on prior case law holding that warrantless trash searches violated the Fourth Amendment and the California Constitution.

The United States Supreme Court determined that the warrantless search of the garbage left outside Greenwood's home would violate the Fourth Amendment only if Greenwood manifested a subjective expectation of privacy in his garbage that society would accept as objectively reasonable.  Greenwood, 486 U.S. at 39, 108 S.Ct. at 1628, 100 L.Ed.2d at 36 (citations omitted).  The Court concluded that by leaving his garbage on a public street, "readily accessible to animals, children, scavengers, snoops, and other members of the public," Greenwood defeated any claim he may have had to Fourth Amendment protection.  Greenwood, 486 U.S. at 40-41, 108 S.Ct. at 1628-29, 100 L.Ed.2d at 36-37.  Furthermore, because Greenwood deliberately placed his garbage at the curb for the express purpose of having a third party, the trash collector, take it, Greenwood could have no reasonable expectation of privacy in the inculpatory items that he discarded.  Greenwood, 486 U.S. at 41, 108 S.Ct. at 1629, 100 L.Ed.2d at 37.

Along these same lines, the United States District Court for the District of Hawaii concluded that the nonintrusive use of a thermal imaging device for the purpose of detecting waste heat did not amount to a search within the meaning of the Fourth Amendment.

U.S. v. Penny-Feeney (D.Hawaii 1991), 773 F.Supp. 220, 228, aff'd on other grounds sub nom. U.S. v. Feeney (9th Cir. 1993), 984 F.2d 1053.

In this case, the Kona Police Department received several tips from known and anonymous informants that Penny-Feeney had been growing marijuana at her residence for several years. To corroborate this information, officers flew over the residence in a helicopter equipped with a thermal imager. The thermal imaging scan revealed a significant amount of heat emanating from the garage on the property. Based on the information obtained from the informants and the thermal imager, a warrant was issued to search the residence. In the search, officers found marijuana plants, grow lights, an electric meter that had been altered to show a lower amount of electric usage, and books and papers showing drug transactions.

The United States District Court determined that Penny-Feeney did not have a legitimate expectation of privacy in the waste heat since she voluntarily vented it outside the garage where it was exposed to the public and she in no way attempted to impede its escape or exercise dominion over it. Moreover, analogizing it to the garbage in Greenwood, the court determined that even if Penny-Feeney could demonstrate a subjective expectation of privacy in the waste heat, such an expectation would not be one that society would accept as objectively reasonable. Penny-Feeney, 773 F.Supp. at 226.

In a similar fashion, the Seventh, Eighth and Eleventh Circuits all relied, at least in part, on Greenwood and compared the excess heat detected by thermal imaging scans to garbage. From this they concluded that the use of a thermal imager is not a search as contemplated by the Fourth Amendment. U.S. v. Meyers (7th Cir. 1995), 46 F.3d 668, cert denied, 116 S.Ct. 213; U.S. v. Pinson (8th Cir. 1994), 24 F.3d 1056, cert denied, 115 S.Ct. 664; U.S. v. Ford (11th Cir. 1994), 34 F.3d 992.

In one such case, Ford, agents of the Florida Department of Law Enforcement, acting upon information that Ford was growing marijuana inside his mobile home, entered the property leased by Ford over a locked gate and traveled a quarter of a mile onto the property. They viewed the mobile home through a thermal imager and determined that it was emitting an inordinate amount of heat through its floor and walls. Based upon this information, the agents obtained a warrant to search the mobile home where they discovered a sophisticated hydroponic laboratory and over 400 marijuana plants. They also discovered that Ford had punched holes in the floor of the mobile home and installed a blower to vent the excess heat generated by grow lamps. Ford, 34 F.3d at 993.

The court in Ford concluded that given Ford's affirmative conduct to expel excess heat from his mobile home, Ford did not seek to preserve the fact of that heat as private, thus he did not

exhibit a subjective expectation of privacy in the heat emitted from his mobile home. Ford, 34 F.3d at 995. The court also stated that even if Ford had a subjective expectation of privacy in the heat escaping from his mobile home, it was not one that society would accept as objectively reasonable. Ford, 34 F.3d at 997. Citing Greenwood, the court in Ford stated that the heat that Ford intentionally vented from his mobile home was a waste byproduct of his marijuana cultivation and is analogous to the inculpatory items Greenwood discarded in his trash. Ford, 34 F.3d at 997.

The problem with this approach is that it does not address the fact that waste heat, unlike garbage, can only be detected by means of a technologically advanced device. It is not readily accessible to "animals, children, scavengers, snoops, and other members of the public," as was the garbage in Greenwood. Furthermore, since dissipation is an inevitable result of heat production, it does not require a deliberate act nor is it preventable in the same way that one can conceal incriminating garbage. The laws of thermodynamics dictate that no matter how much one insulates, heat will still escape. Moreover, the fact that one insulates to keep heat in indicates a subjective expectation of privacy.

### The Canine-Sniff Approach

Many courts have analogized the use of thermal imagers to the use of trained drug-detecting dogs. See Pinson, 24 F.3d at 1058; Ford, 34 F.3d at 997; Meyers, 46 F.3d at 670. Relying on the United States Supreme Court's decision in U.S. v. Place (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, the courts in Pinson, Ford and Meyers all concluded that use of a thermal imager does not constitute a search within the meaning of the Fourth Amendment.

In Place, the defendant was waiting in line at the Miami International Airport to purchase a ticket to New York when his behavior aroused the suspicions of law enforcement officers. The officers approached Place and requested his ticket and his identification. Place complied with their requests and consented to a search of his checked luggage, but, because his flight was about to depart, the officers decided to forego a search. They noted, however, some discrepancies in the street addresses on the tags for Place's two suitcases. Upon further investigation, the officers discovered that neither address existed. They then contacted DEA authorities in New York.

Two DEA agents were waiting for Place when he arrived in New York. After observing more suspicious behavior by Place, they approached him and requested his identification. When Place refused to consent to a search of his luggage, the agents seized his suitcases and subjected them to a "sniff test" by a trained drug-detecting dog. The dog reacted positively to one of the suitcases. The agents subsequently obtained a search warrant and discovered 1125 grams of cocaine.

Place moved to suppress the contents of the luggage seized

from him claiming that the warrantless seizure of the luggage violated his Fourth Amendment rights. In attempting to determine that issue, the United States Supreme Court concluded that exposing luggage to the olfactory senses of a trained drug-detecting dog is not a search because it does not require opening the luggage. Place, 462 U.S. at 707, 103 S.Ct. at 2644-45, 77 L.Ed.2d at 121. The Court stated:

[A canine sniff] does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

Place, 462 U.S. at 707, 103 S.Ct. at 2644, 77 L.Ed.2d at 121. However, in U.S. v. Thomas (2nd Cir. 1985), 757 F.2d 1359, cert denied, 474 U.S. 819, the use of a trained dog to sniff for narcotics outside defendant's apartment was held to constitute a search that, in the absence of a warrant, violated the Fourth Amendment.

In Penny-Feeney, along with analogizing the waste heat to garbage, the court in that case also likened the use of thermal imagers to the use of police dogs trained to sniff and identify the presence of drugs. Relying on U.S. v. Solis (9th Cir. 1976), 536 F.2d 880, wherein the Ninth Circuit Court of Appeals held that use of the dogs was not unreasonable under the circumstances and was not a prohibited search under the Fourth Amendment, the Penny-Feeney court stated:

Use of the [thermal imager], like use of the dog sniff, entailed no embarrassment to or search of the person. Heat emanations, the target here, are comparable to the odor emanations in Solis since they constitute a physical fact indicative of possible crime, not protected communications.

Penny-Feeney, 773 F.Supp. at 227.

The flaw in the canine-sniff approach is that thermal imagers provide information about heat emissions both legal and illegal while canine sniffs only provide information about the presence of illicit substances. A thermal imager cannot limit its detection to information regarding illegal activities. Moreover, the radiation of inordinate amounts of heat does not necessarily imply that

illegal activity is taking place in the same manner that the smell of illicit drugs implies their presence.

The Technological Approach

Some courts have looked at the underlying technological and scientific principles involved in thermal imaging and have determined that the use of a thermal imager is not a search because this technology cannot reveal any "intimate details" about the activities occurring inside the home. The United States Supreme Court considered the warrantless use of other high-technology devices in its decision in Dow Chemical Co. v. United States (1986), 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226.

In Dow, the Environmental Protection Agency (EPA) employed a commercial aerial photographer, using a precision aerial mapping camera, to take photographs of the Dow Chemical Company's facility in Midland, Michigan. Dow had maintained elaborate security around the perimeter of the complex to prevent the exposure of any trade secrets to its competitors. Dow consented to an on-site inspection by the EPA of two powerplants in its 2000-acre complex. However, when the EPA requested consent for a second inspection, Dow refused. The EPA did not seek an administrative search warrant and instead resorted to flying over the facility at altitudes between 1200 and 12,000 feet to obtain photographs.

Dow brought suit against the EPA contending that the taking of aerial photographs constituted a search without a warrant, thereby violating Dow's rights under the Fourth Amendment. The United States Supreme Court disagreed, holding that the taking of aerial photographs of an industrial complex from navigable airspace is not a search as contemplated by the Fourth Amendment. Dow, 476 U.S. at 239, 106 S.Ct. at 1827, 90 L.Ed.2d at 238. In arriving at this conclusion, the Court stated:

Here, EPA was not employing some unique sensory device that, for example, could penetrate the walls of buildings and record conversations in Dow's plants, offices, or laboratories, but rather a conventional, albeit precise, commercial camera commonly used in mapmaking.

Dow, 476 U.S. at 238, 106 S.Ct. at 1826-27, 90 L.Ed.2d at 237. The Court further stated that "the photographs here are not so revealing of intimate details as to raise constitutional concerns." Dow, 476 U.S. at 238, 106 S.Ct. at 1827, 90 L.Ed.2d at 237-38.

The Fifth Circuit Court of Appeals followed the technological approach utilized in Dow in upholding the constitutionality of warrantless thermal imaging in its decision in U.S. v. Ishmael (5th Cir. 1995), 48 F.3d 850, cert denied, 116 S.Ct. 74. In this case, the DEA, using a helicopter equipped with a thermal imager, flew over the Ishmaels' property at altitudes between 500 and 1000 feet to investigate a cement substructure underneath a steel building on the property. A few weeks later, several officers entered the

Ishmaels' property on foot and used a hand-held thermal imager to scan the building. They discovered that an unusual amount of heat was emanating from the substructure and the ground adjacent to it. Using the information from the thermal imaging scans and other information, the DEA obtained a warrant to search the substructure where they discovered more than 700 marijuana plants and several firearms.

The Ishmaels moved to suppress the evidence obtained in the search on the basis that the readings from the thermal imaging scan constituted an unconstitutional search and that, without those readings, the DEA did not have probable cause to obtain a warrant. The District Court granted the motion to suppress and the government appealed.

The Fifth Circuit Court of Appeals held that, because the Ishmaels constructed the laboratory in great secrecy in a basement to a steel building that was not visible from a public road, they exhibited a subjective expectation that their hydroponic laboratory would remain private, thereby meeting the first prong of Katz. Ishmael, 48 F.3d at 854-55. In analyzing whether the Ishmaels' expectation was reasonable, the second prong of the Katz test, the court focused on the technology involved, and its degree of sophistication. The court noted that more sophisticated forms of technology increase the likelihood that their warrantless use will constitute an unreasonable intrusion, but the mere fact that the police employ relatively sophisticated forms of technological surveillance does not render the surveillance unconstitutional. Ishmael, 48 F.3d at 855. According to the Ishmael court, the crucial inquiry is whether the technology revealed any "intimate details." Ishmael, 48 F.3d at 855. Thermal imaging "is a passive, nonintrusive instrument" in that it does not send any beams or rays into the area on which it is fixed or in any way penetrate structures within that area; no intimate details of the home are observed. Ishmael, 48 F.3d at 856.

The court in Ishmael, also examined the manner in which the thermal imager was used. Relying on prior cases from that jurisdiction holding that "there is no business curtilage surrounding a barn lying within an open field," the court stated that the officers were entitled to observe the steel building either by air or on foot because the building stood in an open field. Ishmael, 48 F.3d at 856-57. Thus, the court concluded that a thermal imager, when used in an "open field" does not offend the Fourth Amendment because it is passive and nonintrusive; the sanctity of one's home or business is not disturbed. Ishmael, 48 F.3d at 857.

The Tenth Circuit Court of Appeals had another view of this issue. In U.S. v. Cusumano (10th Cir. 1995), 67 F.3d 1497, the court held that the warrantless use of a thermal imager upon defendants' home violated the Fourth Amendment. Cusumano, 67 F.3d

at 1510.  The defendants in Cusumano did not deny that a search of their home by the police revealed a sophisticated indoor marijuana grow operation in their basement.  They contended, however, that the search warrant was supported by information obtained from a warrantless thermal imaging scan of the home, that the scan violated their Fourth Amendment rights, and that absent the data from the thermal imaging scan, the search warrant lacked probable cause.  While agreeing with defendants' contention that the use of the thermal imager required a search warrant, the Court of Appeals determined that, absent the information from the thermal imaging scan, the search warrant was supported by probable cause.

The court in Cusumano recognized that a thermal imager measures heat gradients across the exterior surface of a building, thus activities that generate a significant amount of heat produce a heat "signature" that the imager can detect.  Cusumano, 67 F.3d at 1501.  Based on this, the court maintained that the pertinent inquiry is not "whether the Defendants retain an expectation of privacy in the 'waste heat' radiated from their home," but rather "whether they possess an expectation of privacy in the heat signatures of the activities, intimate or otherwise, that they pursue within their home."  Cusumano, 67 F.3d at 1502.  Moreover, the court stated that

[t]he machine intrudes upon the privacy of the home not because it records white spots on a dark background but rather because the interpretation of that data allows the government to monitor those domestic activities that generate a significant amount of heat.

Cusumano, 67 F.3d at 1504.

In analyzing the second prong of the Katz test, the court, acknowledging that there is no explicit societal expectation of privacy in the heat signatures of activity within the home, stated:

We rather doubt that society is aware that heat signatures can be read with any greater accuracy than tea leaves.  The contours of the privacy expressly guaranteed the home by the Fourth Amendment are not, however, determined by the outcome of a game of hide-and-seek played by the government and the people.  It is abundantly clear that the people retain a "reasonable expectation of privacy" in the undetected, unmonitored performance of those domestic activities that are not knowingly exposed to the public.

Cusumano, 67 F.3d at 1505-06.  Therefore, the court held that the use of a thermal imager upon the home intruded upon an expectation of privacy that society would deem reasonable.  Cusumano, 67 F.3d at 1506.

We agree with the Tenth Circuit's determination in Cusumano

that the pertinent inquiry is whether defendants possess "an expectation of privacy in the heat signatures of the activities, intimate or otherwise, that they pursue within their home" and which they do not knowingly expose to the public. Cusumano, 67 F.3d at 1502-03. We also agree with the Fifth Circuit's decision in Ishmael that because the grow operation in that case was constructed in great secrecy in a building that was not visible from a public road, defendants exhibited a subjective expectation that the operation would remain private, thereby meeting the first prong of Katz. Ishmael, 48 F.3d at 854-55.

In the case before us on appeal, Defendants' property was heavily wooded and completely fenced. Defendants took several steps to insure their privacy including posting the property with "No Trespassing" signs, painting the fence posts orange, maintaining perimeter and interior fences and locking the gates. Defendants' marijuana grow operation was housed out of view in a building on the property. Thus we conclude, as did the court in Ishmael, that Defendants in the present case met the first prong of Katz because they exhibited a subjective expectation that their grow operation would remain private.

The court in Ishmael determined, however, that defendants in that case did not meet the second prong of Katz because, relying on prior cases from the Fifth Circuit, law enforcement officers were entitled to observe the building either by air or on foot since the building stood in an open field and when a thermal imager is used on a structure in an open field the sanctity of one's home or business is not disturbed. Ishmael, 48 F.3d at 857. Unlike the Fifth Circuit, Montana's prior cases have held that "in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable. . . ." State v. Bullock (1995), 272 Mont. 361, 384, 901 P.2d 61, 75-76.

In the present case, Defendants' fenced their property and posted it with "No Trespassing" signs, just as did the defendants in Bullock. However, the Defendants in the present case went even further than did the defendants in Bullock by housing the activities that they wished to keep private in an enclosed structure rather than merely in "an area of land." Furthermore, the law enforcement officers in the case before us admitted that they also used the thermal imager to scan Defendants' residence, a place where an individual has the greatest expectation of privacy.

Finally, we believe that Montanan's would be shocked and consider it a gross invasion of their privacy to learn that the government could, without their consent and in the absence of a search warrant issued by a neutral and detached magistrate, surreptitiously monitor the heat signatures generated by activities conducted within the confines of their private homes and enclosed

structures for the purpose of drawing inferences about the legality of such activities. It was pointed out in oral argument that with knowledge of the sort of heat profile generated by an indoor marijuana growing operation, there is presently nothing to stop law enforcement from simply selecting structures or a neighborhood at random and then scanning every home (or building) to determine whether any of the structures are generating a suspicious heat signature. We recognize that thermal imaging was not used in that fashion in this case and that the present state of the technology may not be such as to positively identify illegal from legal activity. Notwithstanding, we are also mindful that we live in times during which the sophistication of a given technology typically increases exponentially over a relatively short time, along with the potential for its abuse. While our decision here is not grounded in those presumptions, to completely ignore such factors in our decision-making process, as the State suggests, would be unreasonably myopic, indeed.

Accordingly, applying traditional principles of search and seizure law as adopted in our prior cases to the issue before us, we hold that the use of thermal imaging to obtain evidence of criminal activity is a search subject to the warrant requirement of Article II, Section 11, of Montana's Constitution. Specifically, we conclude that persons have an actual (subjective) expectation of privacy in the heat signatures of activities, intimate or otherwise, which they pursue within the confines of their private homes and enclosed structures and which they do not knowingly expose to the public. Moreover, we conclude that, given Montana's heightened expectations of privacy, best evidenced by the specific protection given that right under Article II, Section 10 of Montana's Constitution (discussed at length in the next section of this opinion), this expectation is one which society in this State is willing to recognize as objectively reasonable.

Right of Privacy Analysis

As mentioned above, our consideration of this issue does not stop with traditional Fourth Amendment analysis, however. Montanans are afforded broader protections to their right of privacy under Article II, Section 10 of Montana's Constitution. On the facts of this case, Article II, Section 10, is implicated along with Article II, Section 11.

In State v. Young (Wash. 1994), 867 P.2d 593, the Supreme Court of Washington held that the use of a thermal imager to perform a warrantless surveillance of defendant's home violated the State of Washington's constitutional protection of defendant's private affairs as well as the Fourth Amendment to the United States Constitution. Washington's constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Young, 867 P.2d at 597 (citing Art. I, Sec. 7, Wash.Const.). The court in Young determined that

the United States Constitution provides "the minimum protection afforded citizens against unreasonable searches by the government." Young, 867 P.2d at 596. Thus the court found that the "private affairs inquiry" under its constitution is broader than the Fourth Amendment's reasonable expectation of privacy inquiry. Young, 867 P.2d at 597.

So too, on the particular search and seizure question at issue here, we find that the inquiry under Montana's right of privacy provision is broader than the usual Fourth Amendment reasonable expectation of privacy inquiry. As we stated earlier in this opinion, Montana's Constitution affords citizens broader protection from warrantless governmental intrusion in search and seizure cases than does the United States Constitution. State v. Solis (1984), 214 Mont. 310, 316, 693 P.2d 518, 521.

> There has been unnecessary emphasis placed on distinguishing right to privacy cases from search and seizure cases. The right to privacy is the cornerstone of protections against unreasonable searches and seizures. Thus, a warrantless search can violate a person's right of privacy and thereby violate the right to be free from unreasonable searches and seizures.

Solis, 693 P.2d at 522-23.

In 1972, the delegates to Montana's Constitutional Convention voiced clear opposition to any form of electronic surveillance of Montana citizens. As Delegate Campbell stated:

> Today, with wiretaps, electronic and bugging devices, photo surveillance equipment and computerized data banks, a person's privacy can be invaded without his knowledge and the information so gained can be misused in the most insidious ways. It isn't only a careless government that has this power to pry; political organizations, private information gathering firms, and even an individual can now snoop more easily and more effectively than ever before. We certainly hope that such snooping is not as widespread as some persons would have us believe, but with technology easily available and becoming more refined all the time, prudent safeguards against the misuse of such technology are needed. Some may urge and argue that this is a legislative, not a constitutional issue. We think the right of privacy is like a number of other inalienable rights; a carefully worded constitutional article reaffirming this right is desirable.
> . . .
> We at the committee felt very strongly that the people of Montana should be protected as much as possible against eavesdropping, electronic surveillance, and such type of

activities. . . . [W]e found that the citizens of Montana were very suspicious of such type of activity.

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pages 1681-82. Delegate Dahood also expressed the concerns of the committee:

First of all, we agreed that we would go along with an amendment that would prohibit electronic surveillance in the State of Montana. . . . After listening to testimony, after examining briefs that were submitted to us, after analyzing the situation, it is inconceivable to any of us that there would ever exist a situation in the State of Montana where electronic surveillance could be justified. And the thinking throughout the United States is, electronic surveillance shall be justified only in matters involving national security, perhaps in matters involving certain heinous federal crimes where the situation is such that in those instances we must risk the right of individual privacy because there is a greater purpose to be served. But within the area of the State of Montana, we cannot conceive of a situation where we could ever permit electronic surveillance. And our intention was--in responding to the proposed amendment; that we would not object to it--was to allow an amendment that would prohibit electronic surveillance in the State of Montana.

Transcript, page 1687.

While thermal imaging is not mentioned, per se, in their comments, it is clear that the delegates' concerns encompassed the invasion of citizens' privacy without their knowledge by means of various sorts of electronic audio and visual monitoring and surveillance equipment. Not only were the delegates wary of existing technology of this type, but they recognized that this sort of technology would continue to be refined and would become more widespread and easily available. In this regard their concerns have been well-founded. Moreover, it is also clear that, in the delegates' view, the use of this sort of technology should be justified only in the most serious of situations, involving heinous crimes where it is necessary to "risk the right of individual privacy because there is a greater purpose to be served." Transcript, page 1687. In the face of this history of Article II, Section 10, we are compelled to conclude that the use of thermal imaging as a criminal investigative tool is the very sort of technology against which Article II, Section 10 of Montana's Constitution was enacted to guard.

Accordingly, we conclude that, in the absence of a search warrant, the use of thermal imaging as a criminal investigative

tool implicates Article II, Section 10 of Montana's Constitution and requires the demonstration of a compelling state interest, other than enforcement of the criminal law.  Finding no such demonstration of a compelling state interest in this case, we hold that the use of thermal imaging at issue here, since no authorizing warrant was issued, violated the Defendants' right to privacy guaranteed under Article II, Section 10 of Montana's Constitution.

Issue 2.

Did the election by the State not to make a videotape of the results obtained by the thermal imager constitute destruction of exculpatory evidence?

In light of our decision to reverse the District Court on the motion to suppress, we need not decide this issue.  However, since this is a case of first impression in Montana, we offer the following for future guidance to the courts.  As with our decision in State v. Grey (1995), 274 Mont. 206, 907 P.2d 951, regarding audio and/or video recordings of Miranda warnings and a detainee's waiver of the same, we do not require that law enforcement officers must, as a matter of law, create a video recording of the results of a thermal imaging scan.  We do, however, note that, absent the demonstration of a legitimate and compelling reason to the contrary, the failure of law enforcement officers to preserve some tangible record of the results of a thermal imaging scan should be viewed with distrust in the judicial assessment of the interpretation of those results.  See Grey, 907 P.2d at 956.

Issue 3.

Did sufficient probable cause exist to support the issuance of a search warrant for Defendants' premises?

In its Findings of Fact, Conclusions of Law and Order denying Defendants' motion to suppress, the District Court determined that, even without the results of the thermal imaging scan, probable cause existed to issue a warrant to search Defendants' premises. Defendants argue to the contrary contending that, with or without the results of the thermal imaging scan, the State's Application for Search Warrant failed to set forth sufficient probable cause to support issuing a warrant.  Since we have already determined that the use of a thermal imager constitutes a search for Fourth Amendment purposes and since no warrant was obtained in this case prior to using the thermal imager, we will excise the results of the thermal imaging scan from the search warrant application and review the remaining information to determine if sufficient probable cause existed for the issuance of the warrant.

An application for a search warrant must state facts sufficient to show probable cause for issuance of the warrant. Section 46-5-221, MCA; State v. Rinehart (1993), 262 Mont. 204, 209, 864 P.2d 1219, 1222.  Probable cause exists when the facts and

circumstances presented to the magistrate would warrant an honest belief in the mind of a reasonable and prudent man that the offense has been, or is being, committed and that the property sought exists at the place designated. State v. Isom (1982), 196 Mont. 330, 343, 641 P.2d 417, 424. However, a determination of probable cause does not require facts sufficient to make a prima facie showing of criminal activity; the issuing magistrate need only determine that there is a probability of such activity. Rinehart, 864 P.2d at 1222.

This Court has adopted the "totality of the circumstances" test set forth in Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, to address the issue of probable cause for issuance of a warrant. State v. Crowder (1991), 248 Mont. 169, 173, 810 P.2d 299, 302. "The totality of the circumstances test is fact specific." State v. Holstine (1993), 260 Mont. 310, 314, 860 P.2d 110, 113 (citing State v. Valley (1992), 252 Mont. 489, 492, 830 P.2d 1255, 1257). We said in Rinehart that if a magistrate issues a search warrant after subjecting the application to this test, a reviewing court must presume that the magistrate's decision is correct. Rinehart, 864 P.2d at 1223 (citing State v. Baldwin (1990), 242 Mont. 176, 183, 789 P.2d 1215, 1220).

"When a magistrate determines that probable cause exists to warrant the issuance of a search warrant, this Court should not only give great deference to that decision but we should also draw every reasonable inference possible to support the decision." State v. Rydberg (1989), 239 Mont. 70, 73, 778 P.2d 902, 904. Thus, the duty of a reviewing court is not to conduct a de novo review of the magistrate's determination, but to simply ensure that the magistrate or lower court had a substantial basis for concluding that probable cause to issue the search warrant existed. Rinehart, 864 P.2d at 1223.

When a search warrant has been issued, a determination of probable cause must be made solely from the information given to the impartial magistrate and from the four corners of the search warrant application. Isom, 641 P.2d at 423. The following is a summary of the facts set forth in the Application for Search Warrant in this case (absent the information from the thermal imaging scan):

1. An informant, who wished to remain anonymous, contacted the NIB and reported that a suspicious structure had been erected on a neighboring property. The informant stated that the structure is approximately 30 feet by 70 feet with a cement floor. It has one blocked window and two doors that are too small for vehicles or large animals to enter. In addition, there are four water drains located in the floor.

2. The informant observed electric power lines

running to the structure, yet he can hear the sound of a generator constantly operating inside it.

3. The informant declared that he has seen several vehicles frequenting the area of the structure and that the occupants of the nearby house are secretive about what is transpiring inside the structure. He said that the structure is always under observation by one of the occupants.

4. NIB agents Hayes and Skuletich observed the structure from a neighboring property and corroborated the existence of the structure, that electrical power lines run to the structure and that the sound of a generator can be heard emanating from within the structure.

5. Another informant, who also wished to remain anonymous, reported that he had observed fuel oil being delivered to the structure. This informant also advised the officers that Jones and McIntyre occupied the residence.

6. Agent Hayes initiated an inquiry and discovered that neither Jones nor McIntyre are covered through Worker's Compensation. Hayes was unable to confirm that the suspects had any gainful employment.

7. The Madison County Sheriff verified that no building permit had been issued for the structure. He also discovered that a recently-drilled well near the structure is only surface water and is not safe for human consumption.

8. A review of phone records for the residence showed that from November through January, the suspects had contacted five different nurseries and/or fertilizer dealers from the area, yet there was no evidence of any gardening. The phone records also revealed that five different electrical supply dealers had been contacted during the same time frame.

Defendants point to several problems with this application leading them to suggest that it does not contain sufficient probable cause to issue a search warrant. First, Defendants contend that the State failed to show the reliability or veracity of the informants. The veracity, reliability and basis of knowledge of informants remain highly relevant factors in determining probable cause under the totality of the circumstances

test.  Rinehart, 864 P.2d at 1222.  This Court has upheld search warrants where the only information in the application relating to the reliability of the informant was a statement by an officer that the informant had been reliable in the past.  Rinehart, 864 P.2d at 1223-24.  However, the application in this case does not state whether the informants were known to law enforcement officers or whether information obtained from these informants may have proved reliable previously.

Corroboration of information through other sources is necessary when the information is hearsay or the informant is anonymous.  Rinehart, 864 P.2d at 1224 (citing Crowder, 810 P.2d at 302).  Here, law enforcement officers observed the structure firsthand and confirmed that it existed, that a generator could be heard operating within the structure and that there were electrical power lines running to the structure.  However, the officers could not corroborate the frequency of visits by certain vehicles, or the delivery of diesel fuel to the structure.

The search warrant application characterized the informants in this case as "concerned citizens."

> [A] citizen informant is presumed reliable.  However, this is not a per se rule.  The reliability of a citizen informant is generally shown by the very nature of the circumstances under which the incriminating information became known.

Valley, 830 P.2d at 1258 (citing State v. Niehaus (Iowa 1990), 452 N.W.2d 184, 189).  In the case before us, the only information we have regarding the "nature of the circumstances" by which the information became known are statements in the search warrant application that the informants contacted the NIB and the sheriff's department to report "suspicious" activity.  Even accepting the information from the informants as true, that information does not in and of itself establish probable cause.

Second, Defendants claim that because the telephone calls to the nurseries and electrical supply dealers were made between November 1993 and January 1994 and the search warrant was not applied for until August 1994, this information is stale and should not have been relied on in issuing the search warrant.  A determination of staleness depends largely on the nature of the property and activity in issue.  State v. Walston (1989), 236 Mont. 218, 223, 768 P.2d 1387, 1390.

> The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later.  The hare and the tortoise do not disappear at the same rate of speed.

Walston, 768 P.2d 1387, 1390 (citing State v. Pease (1986), 222 Mont. 455, 466, 724 P.2d 153, 160). When a criminal activity is continuing in nature, more time may elapse between the observation of the activity and the application for the search warrant without negating probable cause. Walston, 768 P.2d at 1390. Here, because of the continuing nature of the criminal activity, we do not find that the information from the phone calls was stale.

Third, Defendants contend that the assertion in the application that the building has only one window and only two doors which are too small to allow large animals or vehicles to enter is erroneous and thus should be excised from the application. While we do not condone the presence of inaccuracies in search warrant applications, this Court has previously stated that the information contained in an application for a search warrant "will be deemed truthful when the information put forth is believed or appropriately accepted by affiant." State v. Feland (1994), 267 Mont. 112, 115, 882 P.2d 500, 501 (citing State v. Mosley (1993), 260 Mont. 109, 116, 860 P.2d 69, 73). In this case, Agents Hayes and Skuletich observed the structure firsthand and from their vantage point, this information appeared correct. Accordingly, we see no need to excise this information from the application.

Finally, Defendants argue that the information contained in the warrant application is not indicative of criminal activity and that the State made unsupported conclusions. "[F]acts of a description and location of property, while easily confirmable by a driveby, can hardly be regarded as probative of the probability of the presence of contraband therein." Holstine, 860 P.2d at 113. More specifically, the statements contained in the warrant application that Defendants were "secretive" about what was transpiring inside the structure, that Defendants were not covered by workers compensation, that law enforcement officers were unable to confirm gainful employment, that Defendants had not obtained a building permit, and that the well was not fit for human consumption do not indicate criminal activity. Conclusory statements will not provide a substantial basis to conclude that probable cause existed to issue a search warrant. State v. Kaluza (1995), 272 Mont. 404, 410, 901 P.2d 107, 110 (citing State v. Wilson (1992), 254 Mont. 317, 320, 837 P.2d 1346, 1348).

The search warrant application in this case does not contain any information of a criminal history for any of the Defendants or that any of the Defendants had been connected with any criminal activity in the past. "A mere affirmance of belief or suspicion by a police officer, absent any underlying facts or circumstances, does not establish probable cause for the issuance of a search warrant." Isom, 641 P.2d at 424.

The only information suggesting possible criminal activity on the part of Defendants is found in the District Court's order denying Defendants' motion to suppress. In its first finding of

fact, the District Court related information about a routine call regarding a civil disturbance at Defendants' residence in March 1994. While investigating this incident, the Sheriff observed a "sizeable quantity of firearms in the front room." According to the court's finding, the Sheriff's subsequent report to federal authorities of the existence of this cache of firearms led to the NIB's investigation of Defendants. However, this information is not contained within the "four corners" of the application. The information that is contained within the application is just as consistent with a conclusion that legitimate farming operations were occurring on the property as it is with a conclusion that illegal activities were occurring.

Therefore, an examination of the Application for Search Warrant in the present case leads us to the conclusion that the District Court did not have a substantial basis for finding that the application contained sufficient probable cause to issue a warrant to search Defendants' property. Accordingly, we reverse the District Court's order denying Defendants' motion to suppress.

Issue 4.

Did the District Court err in denying Jones' Motion to Dismiss the criminal proceedings against him on double jeopardy grounds after the State obtained a judgment against him in a civil forfeiture action?

Jones appealed the denial of his motion to dismiss the criminal proceedings against him on double jeopardy grounds. However, in light of the recent United States Supreme Court decision in U.S. v. Ursery (1996), ___ U.S. ___, 116 S.Ct. 2135, 135 L.Ed.2d 549, wherein the Court held that civil forfeitures do not constitute "punishment" for purposes of the Double Jeopardy Clause, Jones has now waived his claim of double jeopardy.

Reversed.

/S/   JAMES C. NELSON

We Concur:

/S/   KARLA M. GRAY
/S/   WILLIAM E. HUNT, SR.
/S/   TERRY N. TRIEWEILER
/S/   W. WILLIAM LEAPHART

Chief Justice J. A. Turnage, specially concurring:

I concur in the result of this case; however, I express concern that part of the conclusion of the Court on Issue 1 may be the source of misunderstanding, and a problem for this Court as well as law enforcement.  This opinion states:

Accordingly, we conclude that, in the absence of a search warrant, the use of thermal imaging as a criminal investigative tool implicates Article II, Section 10 of Montana's Constitution and requires the demonstration of a compelling state interest, other than enforcement of the criminal law. [Emphasis supplied.]

Surely this Court does not intend that under no circumstances may thermal imaging ever by used along with other facts to establish probable cause for issuance of a search warrant. In enforcement of the criminal law involving certain crimes that viciously threaten the lives of our citizens, such as homicides at the hands of serial killers or fanatics who may kill hundreds of citizens by bombing public facilities, the use of thermal imaging may be an essential tool, along with other credible information, that would lead to a valid search warrant and arrest of the perpetrators.

/S/  J. A.  TURNAGE