No. 03-572

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 180

STATE OF MONTANA,

        Petitioner and Respondent,

   v.

A BLUE IN COLOR, 1993 CHEVROLET PICKUP,
2-DOOR, MT 14T-D899 VIN/2GCEC19KOP1153371
and 1973 BOAT TRAILER, MT 14-Z20, VIN/SNTR30459MT,
and 1972 BOAT, JOLLY ROGER, HULL #MT2952AC,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                  In and for the County of Custer, Cause No. DV 2002-128
                  The Honorable Gary L. Day, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Terry J. Hanson (argued), Attorney at Law, Miles City, Montana

        For Respondent:

        Honorable Mike McGrath, Montana Attorney General, C. Mark Fowler
        (argued), Assistant Attorney General, Helena, Montana; Garry P. Bunke,
        Custer County Attorney, Paul R. Emerson, Deputy County Attorney, Miles
        City, Montana

                       Argued and Submitted: September 24, 2004

                                   Decided: July 19, 2005

Filed:

                                 Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 This is an appeal from a decision of the Sixteenth Judicial District Court, Custer County, permitting evidence, in a forfeiture proceeding, of items found during an execution of a search warrant on Darrell Pelvit's residence. The search warrant was issued based on evidence seized from a warrantless search of Pelvit's trash. While the true Appellant is the property forfeited--Pelvit's truck, boat, and boat trailer--this Opinion will refer to Pelvit as the Appellant for the sake of clarity and brevity.

¶2 The only issue for review is whether the warrantless search of Pelvit's trash bags violated his right to privacy under Article II, Sections 10 and 11 of the Montana Constitution. The District Court held it did not and therefore denied the Appellant's motion to suppress. We affirm.

## BACKGROUND

¶3 On August 6, 2002, after a several-month investigation of Pelvit, and based on information he was operating a methamphetamine lab, agents of the Eastern Montana Drug Task Force (EMDTF), conducted a warrantless "trash dive" on garbage cans located along a public alley on an open wooden rack behind Pelvit's residence. EMDTF agents removed an opaque trash bag from one of the unlocked garbage cans and discovered inside it pseudoephedrine boxes with corresponding empty blister packs and empty Naptha cans. Naptha is a solvent known to be used in the manufacture of methamphetamine.

¶4 These items formed the basis for the issuance of a search warrant. The search of Pelvit's residence, pickup, and boat occurred on August 9, 2002. The State thereafter petitioned to institute forfeiture proceedings against Pelvit's pickup, boat, and boat trailer,

2

because the search turned up drug-related evidence in these places. Pelvit was also charged with federal drug offenses. Pelvit filed a motion seeking to exclude the evidence found during the execution of the search warrant, arguing the warrant was not valid because it was issued based on evidence obtained from an illegal search of his garbage can. After a hearing on May 30, 2003, the District Court denied Pelvit's motion to suppress the evidence, holding Pelvit did not have a reasonable expectation of privacy in his garbage that society was willing to recognize as reasonable. Pelvit now appeals from this ruling.

## STANDARD OF REVIEW

¶5     Although this is a civil forfeiture proceeding, the evidence in question is subject to the exclusionary rule and can be suppressed if it was obtained through an illegal search. *One 1958 Plymouth Sedan v. Pennsylvania* (1965), 380 U.S. 693, 698, 85 S.Ct. 1246, 1249, 14 L.Ed.2d 170, 173. We review a district court's ruling on a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the court's interpretation of the law is correct. *State v. Romain*, 1999 MT 161, ¶ 14, 295 Mont. 152, ¶ 14, 983 P.2d 322, ¶ 14.

**DISCUSSION**

¶6 **Did the District Court err in concluding the warrantless search of Pelvit's trash bags did not violate his right to privacy under Article II, Sections 10 and 11 of the Montana Constitution, and on that basis denying Pelvit's motion to suppress?**

¶7 Pelvit maintains he exhibited both an objective and subjective expectation of privacy in the contents of his trash, which society is willing to recognize as reasonable. Pelvit claims he took steps to conceal the contents of his trash by putting it in opaque bags in cans located on the rear of his property. He argues a search warrant was required to authorize the search of his trash, and that since one was not obtained, the search was illegal and the items seized should have been suppressed. Pelvit proceeds to argue that the evidence found in his truck and boat should have been suppressed pursuant to the "fruit of the poisonous tree" doctrine, because it would not have been discovered but for the unlawful warrantless search of his trash. Pelvit maintains that *State v. Siegal*, in which we held the warrantless use of thermal imaging violated the defendant's right to privacy, is controlling. *State v. Siegal* (1997), 281 Mont. 250, 278, 934 P.2d 176, 192 (*overruled in part*, *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19). Pelvit also points to several cases from other state supreme courts in support of his argument.

¶8 The State counters that Pelvit abandoned his trash, and as a result, he had no actual or subjective expectation of privacy in it. In support of this argument, the State points out Pelvit took no steps to secure the trash; rather, he placed it in an unlocked garbage can set out in a public alley for collection. Further, the State asserts society is not willing to

4

recognize Pelvit's claimed expectation of privacy in his trash as reasonable. The State distinguishes *Siegal* and cites language from that decision to support its position.

¶9 The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. Montanans have a heightened expectation of privacy, pursuant to the protections found at Article II, Sections 10 and 11 of the Montana Constitution. *State v. Scheetz* (1997), 286 Mont. 41, 45, 950 P.2d 722, 724. An impermissible search and seizure occurs within the meaning of Article II, Section 10 of the Montana Constitution when a reasonable expectation of privacy has been breached. *State v. Smith*, 2004 MT 234, ¶ 9, 322 Mont. 466, ¶ 9, 97 P.3d 567, ¶ 9. However, where no reasonable expectation of privacy exists, there is neither a "search" nor a "seizure" within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. *Smith*, ¶ 9.

¶10 To determine whether Pelvit had a reasonable expectation of privacy in his trash, we consider: (1) whether he had an actual expectation of privacy in his trash; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion. *Smith*, ¶ 10. Analyzing the first two factors, the United States Supreme Court in *California v. Greenwood* (1998), 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30, 37, held the Fourth Amendment does not prohibit a warrantless search and seizure of trash left for collection in an area accessible by the public, reasoning that a person has no reasonable expectation of privacy, which society is willing to recognize, in items

5

knowingly exposed to the public. However, given Montanans' heightened expectation of privacy pursuant to our Constitution, we will look to our case law in analyzing this inquiry.

¶11 Pelvit maintains that our decision in *Siegal* is controlling. In *Siegal*, we were asked to decide whether the warrantless use of a thermal imager by narcotics officers constituted an unconstitutional search. The officers, acting upon information from informants, used the imager to scan buildings located on Siegal's property to measure the heat emissions coming from them. The officers were particularly interested in a newly constructed building located near Siegal's residence, and scanned it from a vantage point located on property adjacent to Siegal's. The building in question was not visible from the road, and the property on which it was located was heavily wooded, completely fenced, and posted with "No Trespassing" signs. *Siegal*, 281 Mont. at 254, 934 P.2d at 178. Upon detecting considerable heat emanating from the building, the officers used the imager results to secure a search warrant, and discovered a marijuana grow operation in the building. Siegal sought suppression of the results of the search on the grounds that the warrantless use of the thermal imager violated his constitutional rights. We agreed with Siegal and reversed his conviction. *Siegal*, 281 Mont. at 253, 934 P.2d at 178.

¶12 We concluded in *Siegal* that persons had an actual expectation of privacy in the heat signatures of their activities, intimate or otherwise, that occurred within the confines of their private homes and other enclosed structures that they do not knowingly expose to the public. *Siegal*, 281 Mont. at 275, 934 P.2d at 191. In so doing, we considered it significant that the defendants had gone to considerable trouble to keep their activities and property away from

6

prying eyes, by fencing and posting their property and keeping their activities within the walls of private enclosed structures. *Siegal*, 281 Mont. at 273, 934 P.2d at 190. Here, by contrast, while Pelvit placed his garbage in opaque bags, he took no steps to keep it from either the garbage collector or the public at large; in fact, he put it out at the edge of the alley in a location he could neither see from his home or isolate from the populace for the specific purpose of having it collected and taken away by a third party. We therefore do not find *Siegal* controlling.

¶13    In *State v. Hill*, 2004 MT 184, 322 Mont. 165, 94 P.3d 752, we held that an unauthorized driver of a rental car had no actual expectation of privacy in two duffel bags found in the trunk of the car because he lacked the "right to exclude others from the trunk of the car." *Hill*, ¶ 25. We further noted that even if Hill had a subjective expectation of privacy, this expectation was not reasonable because he "twice disavowed any interest in the contents of the trunk," *Hill*, ¶ 33, and "voluntarily relinquished any control he exercised over the contents of the trunk." *Hill*, ¶ 31. Here, Pelvit similarly relinquished mastery over his garbage when he placed it in an area beyond his immediate control for the specific purpose of having a stranger haul it away.

¶14    Voluntary relinquishment of one's interest in an item or one's control over that item is akin to the legal concept of abandonment. Abandonment is defined as "[t]he relinquishment of a right; the giving up of something to which one is entitled." *Hawkins v. Mahoney*, 1999 MT 296, ¶ 14, 297 Mont. 98, ¶ 14, 990 P.2d 776, ¶ 14 (citing *Conway v. Fabian* (1939), 108 Mont. 287, 306, 89 P.2d 1022, 1029). We have stated that when a

7

person intentionally abandons his property, that person's expectation of privacy with regard to that property is abandoned as well. *State v. Hamilton*, 2003 MT 71, ¶ 26, 314 Mont. 507, ¶ 26, 67 P.3d 871, ¶ 26 (citing *State v. Amaya* (1987), 227 Mont. 390, 392, 739 P.2d 955, 957). Moreover, as did the United States Supreme Court in *Greenwood*, this Court has frequently stated that what a person knowingly exposes to the public is not protected by the Montana Constitution. *State v. Griffin*, 2004 MT 331, ¶ 25, 324 Mont. 143, ¶ 25, 102 P.3d 1206, ¶ 25; *State v. Elison*, 2000 MT 288, ¶ 49, 302 Mont. 228, ¶ 49, 14 P.3d 456, ¶ 49; *Siegal*, 281 Mont. at 278, 934 P.2d at 190-91; *Scheetz*, 286 Mont. at 49, 950 P.2d at 726-27; *State v. Bullock* (1995), 272 Mont. 361, 375, 901 P.2d 61, 70.

¶15   In determining whether someone has abandoned his property, the intention is the first and paramount inquiry. This intention is ascertained not only from the statements which may have been made by the owner of the property, but also from the acts of the owner. *Hawkins*, ¶ 14 (citing *Conway*, 108 Mont. at 306, 89 P.2d at 1029). If no express intent exists, intent may be inferred by the acts of the owner. *Hawkins*, ¶ 16. Here, because no express intent with respect to his garbage was announced, we are left with Pelvit's action of placing his garbage in an alleyway for collection. It is impossible to reconcile such an action with Pelvit's claimed expectation of privacy. In *Elison*, we spoke in terms of placing an object beyond the purview of the public in a place from which one intends to exclude others. *Elison*, ¶ 49. Here, by contrast, in leaving his trash for a third party to pick up, Pelvit evidenced the opposite intent--an intent *not* to exclude others.

8

¶16    Even if we assume for the sake of argument that Pelvit had an actual expectation of privacy in the garbage he placed for collection, we must still determine whether society would be willing to recognize that expectation as objectively reasonable. *Smith*, ¶ 10. In analyzing this inquiry, we logically look to society's experience with respect to garbage placed in an alley for the trash collector. While garbage bags oftentimes remain intact until their contents are collected by a designated hauler, it is also common to see homeless people, stray pets and wildlife, curious children, and scavengers rummaging through trash set out for collection, in hopes of finding food, salvageable scrap, or deserted treasure. *See Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628-29, 100 L.Ed.2d at 36-37. The wind and the elements are also factors, particularly in Montana. Routinely, cans are knocked over, bags are exposed to the predations of dogs and raccoons, and garbage is found strewn across streets and alleyways. In short, society's experience with trash left at the alley or curb for collection is anything but consistent with an objective expectation of privacy.

¶17    We conclude that when Pelvit placed his garbage at the alley's edge for collection, he abandoned his garbage; as a result, he had no expectation of privacy in it that society would be willing to accept as reasonable. Absent such a reasonable expectation of privacy, there is neither a "search" or "seizure" within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. *See Smith,* ¶ 9. We further conclude that the burden of proving that garbage has been abandoned by the defendant shall be on the State. However, this conclusion does not end our analysis, as this decision will guide the conduct

9

of police in the future, and will also have an impact upon the expectations of a public that is compelled, for lack of easy and lawful alternatives, to use public refuse collection services.

¶18  While we do not believe the public would accept as reasonable an expectation of privacy in abandoned garbage, neither do we believe the public would be entirely comfortable with the image of police officers overtly foraging through curbside garbage. Nor do we believe the public would embrace the idea of police officers conducting random and arbitrary fishing expeditions through garbage cans, in the hopes of finding contraband. Garbage is unique in the sense that, while we may have abandoned it, if we want it hauled away, we are generally obligated to comply with local refuse ordinances by placing it for collection in a particular place.  In exchange for such compliance, it seems only fair that certain constraints--inoffensive to legitimate law enforcement interests--should limit the nature and extent of permissible government intrusions into it.  Therefore, so as to strike a balance between such public concerns and the needs of law enforcement, we deem it appropriate to qualify our holding.  In doing so, we borrow from the analysis of the Indiana Supreme Court set forth in its March 24, 2005, opinion in the case of *Litchfield v. State* (Ind. 2005), 824 N.E.2d 356.

¶19  In *Litchfield*, a case similar to the case at bar, the Indiana Supreme Court addressed the reasonableness of a police search of trash recovered from the place where it was left for collection.  While the Court upheld the search on abandonment grounds, it concluded that certain limitations should attach to the warrantless seizure of trash.  Specifically, the Court imposed two constraints: first, for such a seizure to be reasonable, the garbage must be

10

quickly retrieved by officers "in substantially the same manner as the trash collector would take it." *Litchfield*, 824 N.E.2d at 363. In other words, officers cannot openly rummage through a person's garbage at the curb or in the alley, to the embarrassment or indignity of the owner. Second, so as to prevent wholesale or random searches, officers must have an articulable individualized suspicion that a crime is being committed, essentially the same as is required for a "Terry stop" of an automobile, in order to justify the garbage seizure. *Litchfield,* 824 N.E.2d at 364. We conclude that these constraints are reasonable and justified; they balance the State's interest in conducting a legitimate investigatory search against the public's expectation that, if they place their garbage for collection as the law requires, curbside chaos will not ensue. We therefore incorporate these limitations into our decision today.

¶20    Here, the search of Pelvit's trash satisfied both of the constraints we have adopted. The garbage bag was seized and removed from the area before it was searched. Moreover, the record reflects that, based on information that he was operating a methamphetamine lab, Pelvit had been the subject of a several-month investigation prior to the day upon which the search of his garbage was undertaken. We therefore need not remand, as the Indiana Supreme Court did in *Litchfield*, for a finding of whether the officers possessed reasonable suspicion sufficient to obtain and search Litchfield's garbage. *Litchfield*, 824 N.E.2d at 364.

¶21    In conclusion, given the undisputed facts before us, we determine that the State met its burden of proving Pelvit abandoned his trash. We further conclude that the seizure of the garbage was conducted in a reasonable and unobtrusive manner, and that the police had

11

sufficient particularized suspicion to justify the warrantless search of Pelvit's garbage. Therefore, the District Court did not err in denying Pelvit's motion to suppress this evidence.

¶22 Finally, we limit this Opinion to the facts presented here. Specifically, we do not encompass within the ambit of our decision garbage located in a yard or other premises that has not been placed for collection, nor do we include any other situation where intent to abandon is not directly or inferentially demonstrated.

¶23 For the foregoing reasons, we affirm.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE
/S/ RICHARD A. SIMONTON

Honorable Richard A. Simonton, District Court Judge
sitting for former Justice Jim Regnier

12

Justice James C. Nelson concurs.

¶24     I have signed our Opinion because we have correctly applied existing legal theory and constitutional jurisprudence to resolve this case on its facts.

¶25     I feel the pain of conflict, however. I fear that, eventually, we are all going to become collateral damage in the war on drugs, or terrorism, or whatever war is in vogue at the moment. I retain an abiding concern that our Declaration of Rights not be killed by friendly fire. And, in this day and age, the courts are the last, if not only, bulwark to prevent that from happening.

¶26     In truth, though, we are a throw-away society. My garbage can contains the remains of what I eat and drink. It may contain discarded credit card receipts along with yesterday's newspaper and junk mail. It might hold some personal letters, bills, receipts, vouchers, medical records, photographs and stuff that is imprinted with the multitude of assigned numbers that allow me access to the global economy and vice versa.

¶27     My garbage can contains my DNA.

¶28     As our Opinion states, what we voluntarily throw away, what we discard--i.e., what we abandon--is fair game for roving animals, scavengers, busybodies, crooks and for those seeking evidence of criminal enterprise.

¶29     Yet, as I expect with most people, when I take the day's trash (neatly packaged in opaque plastic bags) to the garbage can each night, I give little consideration to what I am throwing away and less thought, still, to what might become of my refuse. I don't necessarily envision that someone or something is going to paw through it looking for a

13

morsel of food, a discarded treasure, a stealable part of my identity or a piece of evidence. But, I've seen that happen enough times to understand--though not graciously accept--that there is nothing sacred in whatever privacy interest I think I have retained in my trash once it leaves my control--the Fourth Amendment and Article II, Sections 10 and 11, notwithstanding.

¶30 Like it or not, I live in a society that accepts virtual strip searches at airports; surveillance cameras; "discount" cards that record my buying habits; bar codes; "cookies" and spywear on my computer; on-line access to satellite technology that can image my back yard; and microchip radio frequency identification devices already implanted in the family dog and soon to be integrated into my groceries, my credit cards, my cash and my new underwear.

¶31 I know that the notes from the visit to my doctor's office may be transcribed in some overseas country under an out-sourcing contract by a person who couldn't care less about my privacy. I know that there are all sorts of businesses that have records of what medications I take and why. I know that information taken from my blood sample may wind up in databases and be put to uses that the boilerplate on the sheaf of papers I sign to get medical treatment doesn't even begin to disclose. I know that my insurance companies and employer know more about me than does my mother. I know that many aspects of my life are available on the Internet. Even a black box in my car--or event data recorder as they are called--is ready and willing to spill the beans on my driving habits, if I have an event--and I really trusted that car, too.

¶32     And, I also know that my most unwelcome and paternalistic relative, Uncle Sam, is with me from womb to tomb.  Fueled by the paranoia of "ists" and "isms," Sam has the capability of spying on everything and everybody--and no doubt is.  But, as Sam says:  "It's for my own good."

¶33     In short, I know that my personal information is recorded in databases, servers, hard drives and file cabinets all over the world.  I know that these portals to the most intimate details of my life are restricted only by the degree of sophistication and goodwill or malevolence of the person, institution, corporation or government that wants access to my data.

¶34     I also know that much of my life can be reconstructed from the contents of my garbage can.

¶35     I don't like living in Orwell's *1984*; but I do.  And, absent the next extinction event or civil libertarians taking charge of the government (the former being more likely than the latter), the best we can do is try to keep Sam and the sub-Sams on a short leash.

¶36     As our Opinion states, search and seizure jurisprudence is centered around privacy expectations and reasonableness considerations.  That is true even under the extended protections afforded by Montana's Constitution, Article II, Sections 10 and 11.  We have ruled within those parameters.  And, as is often the case, we have had to draw a fine line in a gray area.  Justice Cotter and those who have signed the Opinion worked hard at defining that line; and I am satisfied we've drawn it correctly on the facts of this case and under the conventional law of abandonment.

¶37 That said, if this Opinion is used to justify a sweep of the trash cans of a neighborhood or community; or if a trash dive for Sudafed boxes and matchbooks results in DNA or fingerprints being added to a forensic database or results in personal or business records, credit card receipts, personal correspondence or other property being archived for some future use unrelated to the case at hand, then, absent a search warrant, I may well reconsider my legal position and approach to these sorts of cases--even if I have to think outside the garbage can to get there.

¶38 I concur.

/S/ JAMES C. NELSON

Justice W. William Leaphart dissenting.

¶39 Since I find the Court's analysis both internally incoherent and inconsistent with our privacy jurisprudence, I dissent.

¶40 The Court's reliance upon our decision in *State v. Hill*, 2004 MT 184, 322 Mont. 165, 94 P.3d 752, is misplaced for several reasons, and is fairly easily disposed of.  Maj. Op., ¶ 13.  We based our conclusion that Hill lacked the right to exclude others from the trunk of the rental car on the fact that he was driving the car without authorization.  *Hill*, ¶ 25.  As we reasoned later in that opinion:

> While Hill apparently took pains to ensure that the duffel bags were hidden from view, he lacked the authority that the defendant in *Elison* had to either grant or withhold permission to see them since he was not in lawful control of the vehicle.  [*State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456.]

*Hill*, ¶ 31; *see also Hill*, ¶ 32 (concluding that "one does not have a reasonable expectation of privacy in an unlawfully possessed rental car"). We found Hill's lack of the right to exclude significant because it "suggest[ed] a corresponding lack of a subjective expectation of privacy" in his duffel bags. *Hill*, ¶ 25.

¶41 Such is not the present case. While the citizen may not expect as much privacy in the garbage that she sets out for collection as, say, the defendants in *Siegal* did in their compound, *see* Maj. Op., ¶¶ 11-12, this is not to say that she expects none. Indeed, much of society's growing awareness of, and determination to combat, identity theft stems precisely from our expectation that our garbage will remain private, and from the outrage that a stranger's violation thereof naturally inspires. *See State v. Scheetz* (1997), 286 Mont. 41, 48, 950 P.2d 722, 726 (desire to protect one's privacy lies "at the foundation [of] the constitutional safeguards that exist to protect" it).

¶42 Our further rejection of Hill's claim to a reasonable expectation of privacy in his duffel bags is accurately related by the Court. Maj. Op., ¶ 13. However, the more closely one examines this aspect of that decision as well, the less favorable to the Opinion it proves to be. As the Court notes, we found Hill's expectation of privacy unreasonable in part because he "voluntarily relinquished any control he exercised over the contents of the trunk." Maj. Op., ¶ 13 (quoting *Hill*, ¶ 31). How did he do this? "[B]y twice overtly denying knowledge or ownership of anything [in the trunk] and once implicitly doing so," *Hill*, ¶ 31. While withdrawing his original grant of permission to the officers to search the trunk, Hill said, "I mean my friend rented the car, and what if she put something in there I don't know

17

about[?]" *Hill*, ¶ 7. And when the officers, by now having opened the trunk, asked Hill if the duffel bags they had found were his, "[h]e responded that they were not." *Hill*, ¶ 10.

¶43 This, of course, is not what we do when we leave our household refuse for collection. The act itself links the garbage ineluctably to us, as does the latter's appearance on our property in our garbage can, and this connection continues at least until our trash is commingled with that of others. This distinction, unappreciated by the Court, is a crucial one, because by disclaiming any connection to the marijuana-filled duffel bags, Hill naturally disclaimed all privacy interest in them, as well. Leaving garbage for collection, by contrast, constitutes at most proprietary *renunciation*, not absolute *disavowal*.

¶44 Perhaps most damaging to the Court's reliance on *Hill*, however, is the simple fact that the police obtained permission from the owner of the rental car–the rental car company–to search the trunk. "A knowing and voluntary consent by a citizen [here, the company] to a search is a recognized exception to the warrant requirement." *Hill*, ¶ 34 (citation and internal quotation marks omitted). Unlike *Hill*, there is no question of consent in the present case. Maj. Op., ¶ 3.

¶45 In the Court's view, however, consent to search the garbage would not enter into the present case, anyway, because there was no owner from whom to obtain consent–Pelvit abandoned his refuse (so the argument runs) by setting it out for collection. Maj. Op., ¶ 14. This is legal error, pure and simple. We have defined "abandonment" as "the giving up of a thing absolutely, *without reference to any particular person or purpose*." *Moore v. Sherman* (1916), 52 Mont. 542, 546, 159 P. 966, 967 (emphasis added). When we haul our

18

household refuse out for collection, however, we have both a person and a purpose in mind. We intend nothing more nor less than that the garbage collector will dispose of it for us at the designated location. "By definition, there cannot be an abandonment to a particular person[.]" 1 C.J.S. *Abandonment* § 3b (citing *Moore*; *Norman v. Corbley* (1905), 32 Mont. 195, 79 P. 1059).

¶46    The Court then compounds its error with this vague, sweeping, and entirely unsupported assertion: "Voluntary relinquishment of one's interest in an item or one's control over that item is *akin to* the legal concept of abandonment." Maj. Op., ¶ 14 (emphasis added). The passage serves as the means by which to nudge the practice of leaving one's garbage for collection into the category of "abandonment," a characterization which I have already demonstrated to be legally erroneous. It is useful, however, to examine the statement further.

¶47    The Court has already conceded that Pelvit relinquished only "immediate control" of his garbage. Maj. Op., ¶ 13. Remembering and retrieving items which we have unintentionally or rashly discarded is a fairly common action, and one which we could hardly perform if we enjoyed no control over our garbage whatsoever. Therefore, it must be the cession of "*immediate* control" that is *akin* (whatever that may mean) to the legal concept of abandonment.

¶48    Now consider the common practice of parking one's car in the driveway and leaving it there to enter one's home. This surely constitutes a relinquishment of "immediate control" over the vehicle. On the Court's view, then, this amounts to abandonment, and should result

19

in a loss of all privacy protection in the car.  Maj Op., ¶ 14 ("[w]e have stated that when a person intentionally abandons his property, that person's expectation of privacy with regard to that property is abandoned as well").  Does it in fact do so?  No.  *State v. Tackitt*, 2003 MT 81, 315 Mont. 59, 67 P.3d 295 (privacy protection extends to automobile parked at residence).  Or consider mailing a letter.  Does placing the letter in the mailbox for collection by the postman disqualify it for privacy protection?  No, not even under the United States Constitution, a document which affords but meager privacy protection in comparison with our State Constitution.  *California v. Greenwood* (1988), 486 U.S. 35,  55, 108 S.Ct. 1625, 1637, 100 L.Ed.2d 30, 46 (Brennan, J., dissenting).

¶49    Even if Pelvit abandoned his garbage, moreover, this would not necessarily mean that he abandoned all privacy interest therein, the Court's assertion to the contrary notwithstanding.  Maj. Op., ¶ 14.  Not even the United States Constitution equates proprietary abandonment with abandonment of privacy interests.  As Justice White, the author of the *Greenwood* decision, wrote in his dissent from the earlier *California v. Rooney*:

> [T]he premise that property interests control the right of officials to search and seize has been discredited.  *Oliver v. United States,* 466 U.S. 170, 183, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967).  The primary object of the Fourth Amendment is to protect privacy, not property, and the question in this case, as the Court of Appeal recognized, is not whether Rooney had abandoned his interest in the property-law sense, but whether he retained a subjective expectation of privacy in his trash bag that society accepts as objectively reasonable.  *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, ----, 94 L.Ed.2d 714 (1987); *California v. Ciraolo,* 476 U.S. 207, 211,

212, 106 S.Ct. 1809, 1811, 1812, 90 L.Ed.2d 210 (1986); *Oliver v. United States, supra,* 466 U.S., at 177, 104 S.Ct., at 1740; *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Katz v. United States, supra,* 389 U.S., at 361, 88 S.Ct., at 516 (Harlan, J., concurring).

*California v. Rooney* (1987), 483 U.S. 307, 320, 107 S.Ct. 2852, 2859, 97 L.Ed.2d 258, 268, (White, J., dissenting).

¶50 The Court's position is a throwback to the old abandonment-and-curtilage analysis that *Katz* superseded almost four decades ago. 1 Wayne R. LaFave, Search and Seizure § 2.6(c) at 689-90 [hereinafter LaFave]; *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. The fact that we now base our three-pronged test for impermissible governmental intrusions upon *Katz* only highlights the absurdity of the Court's stance. *See State v. Bullock* (1995), 272 Mont. 361, 375, 901 P.2d 61, 70. Nor is it too late to strike *Hamilton*'s ill-conceived statement from our case law; it functions in that opinion as *dictum*, not holding, as the Court tacitly acknowledges ("stated," not "held"), and seems an unsuitable candidate for promotion, to put it mildly. LaFave, § 2.6(c) at 695 (proprietary abandonment equalling privacy abandonment a "broad and unsound concept").

¶51 While it is true that we have held Article II, Section 10, of our Constitution not to protect whatever privacy interest the citizen might claim in objects which he has knowingly exposed to the public, Maj. Op., ¶ 14, *see, e.g., State v. Griffin*, 2004 MT 331, ¶ 25, 324 Mont. 143, ¶ 25, 102 P.3d 1206, ¶ 25, it is also beside the point, for Pelvit did not knowingly expose his garbage to public view. He put it into opaque garbage bags, put the bags into garbage cans, and closed the cans. *See* Maj. Op., ¶ 3. To imply, as the Court does, that

21

Pelvit knowingly exposed his garbage to the public at large is thus to credit Montana's citizenry with X-ray vision.

¶52    Though perhaps not to the extent of imputing super-human powers to our citizens, the Court similarly overstates its case when it claims that garbage cans "[r]outinely . . . are knocked over" and their contents "strewn across streets and alleyways." Our cities' thoroughfares are not, I am happy to report, awash in garbage. In any event, as the Vermont Supreme Court wrote in *State v. Morris*:

> [T]he mere possibility that unwelcome animals or persons might rummage through one's garbage bags does not negate the expectation of privacy in the contents of those bags any more than the possibility of a burglary or break-in negates an expectation of privacy in one's home or car, or the possibility that an operator or party-line caller will listen in on a telephone conversation negates an expectation of privacy in the contents of the conversation, or the possibility that a cleaning person or house guest will exceed the scope of a visit negates an expectation of privacy in a hotel room or home.

*State v. Morris* (Vt. 1996), 680 A.2d 90, 99, 62 A.L.R.5th 729, 743; *see also* LaFave § 2.6(c) at 692 (presence of risks to privacy attendant upon customary disposal of garbage "hardly means that the government is constitutionally unconstrained in adding to those risks"). As we stated in *State v. Hamilton*, 2003 MT 71, 314 Mont. 507, 67 P.3d 871, "[t]he reality that certain people lack respect for the property of another is no reason to diminish the expectation of privacy we protect so jealously in Montana." *Hamilton*, ¶ 30.

¶53    It is therefore odd to find the Court requiring that, before officers can seize and search garbage, they must have an "articulable individualized suspicion that a crime is being committed" in the interests of balancing the State's interest in conducting a legitimate

22

investigatory search against the public's expectation that, "if they place their garbage for collection as the law requires, curbside chaos will not ensue." Maj. Op. ¶ 19. When the Court has spent the better part of its opinion attempting to show that Pelvit did not have a reasonable expectation of privacy in his garbage, it is internally inconsistent for the Court to continue characterizing this intrusion as a *seizure* and *search* and, on that basis, to impose a requirement of "articulable individualized suspicion." If, as the Court posits, Pelvit had no reasonable expectation of privacy in the garbage, then there was neither a *seizure* nor *search* of the garbage and no legal constraints are constitutionally required. Either Pelvit had an expectation of privacy or he did not. I would conclude that he did.

¶54   I dissent.


                                        /S/ W. WILLIAM LEAPHART


Chief Justice Karla M. Gray joins in the foregoing dissent of Justice Leaphart.

                                        /S/ KARLA M. GRAY